**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| PUMA NORTH AMERICA, INC., | Case No. |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| ZURICH AMERICAN INSURANCE COMPANY, | |
| Defendant. | |

## COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF

Plaintiff PUMA North America, Inc. ("PUMA" or the "Insured") files this Complaint for damages and declaratory judgment against Zurich American Insurance Company ("Zurich" or the "Insurer"), alleging the following:

## NATURE OF THIS ACTION

1.      This is an action for declaratory judgment and breach of contract arising out of Zurich's refusal and failure to provide insurance coverage to PUMA in connection with PUMA's significant losses resulting from the COVID-19 pandemic, which are squarely covered by Zurich's "all risks" policy. Indeed, despite PUMA paying significant premiums for this coverage, Zurich has tried to rewrite its policy in hindsight to evade its clear-cut coverage obligations.

2.      PUMA is one of the world's leading sports lifestyle brands. Known for both sports and fashion, PUMA designs and develops quality footwear, apparel and accessories. PUMA sells its products through wholesale accounts and PUMA stores throughout the United States and internationally, as well as online. PUMA prides itself on its reputation and ability to deliver exceptional products to its customers.

3.      Beginning in March 2020, the COVID-19 pandemic and the unprecedented civil orders, advisements, and/or directives issued in connection with the COVID-19 pandemic (the "Civil Orders") caused PUMA to suffer tens of millions of dollars in losses. Fortunately, PUMA had purchased from Zurich an "all risks" property damage and business interruption insurance policy for the policy period July 1, 2019 to July 1, 2020 (the "Zurich Policy" or "Policy"), which insures PUMA against "direct physical loss of or damage to" property at covered locations caused by "all risks" except those specifically excluded.

4.      PUMA's losses fell squarely into the coverage of the Policy, including the Policy's main "Property Damage" and "Time Element" (*i.e.*, business interruption) coverages, as well as under various "Special Coverages", including Civil or Military Authority coverage, Contingent Time Element Extended coverage, Decontamination Costs coverage, Ingress/Egress coverage, and Protection and Preservation of Property coverage, among other potentially applicable coverage provisions.

5.      Nevertheless, Zurich has wrongfully failed to cover any of PUMA's losses.

6.      Thus, PUMA was forced to bring this action for breach of contract and declaratory judgment that it is entitled to the full amount of coverage for its losses, and for damages resulting from Zurich's breaches of its contractual obligations.

## PARTIES

7.      Plaintiff PUMA North America, Inc. is a Delaware corporation with its principal place of business in Westford, Massachusetts.

8.      On information and belief, defendant Zurich American Insurance Company is organized under the laws of New York with its principal place of business in Schaumburg,

Illinois, and is authorized to do business and issue insurance policies in the State of Illinois, among other places.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction to hear this case under 28 U.S.C. § 1332 based on complete diversity of citizenship between the parties and because the amount in controversy, exclusive of the costs and interest, exceeds $75,000.

10.      The Court has personal jurisdiction over Zurich because Zurich is licensed to transact, and transacts, business in the State of Illinois and this District.

11.      Venue is proper in this District because Zurich resides in this District and a substantial part of the events giving rise to PUMA's claims occurred in this District, including issuance of the Policy.

## FACTUAL ALLEGATIONS

### I.      The Coronavirus Outbreak

12.      In December 2019, during the term of the Policy, an outbreak of the severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), which causes the infectious disease COVID-19, was first identified in Wuhan, Hubei Province, China.  In an event that has not occurred in more than a century, a global pandemic ensued, with the virus quickly spreading to Europe and then to the United States.

13.      From the first reported case in the United States in January 2020 to the present, the impact of the virus and the resulting disease has been staggering on life and property.  The impact on footwear and apparel businesses such as PUMA has been particularly acute with physical stores

shut down, customers being prevented from accessing brick-and-mortar stores, and declining consumer spending.

14.     As of February 26, 2020, the Centers for Disease Control and Prevention (the "CDC") warned that community transmission of COVID-19 existed in the United States.  The virus was spreading with no ability to trace the origins of new infections.[1]

15.     On March 11, 2020, the World Health Organization (the "WHO") declared COVID-19 a global pandemic.  As a declared pandemic, COVID-19 is present globally, including at each of PUMA's insured properties.

16.     The nature of the coronavirus has made containment particularly challenging, specifically due to it having at least three different modes of transmission.

17.     First, COVID-19 spreads when an uninfected person inhales droplets of the saliva or nasal discharge of an infected person.[2]  This is called airborne transmission.  Droplets of saliva or nasal discharge from an infected person can linger in the air for minutes or hours, and can affect personal and real property, including indoor air within the real property.[3]

18.     Second, COVID-19 spreads through smaller droplets known as aerosols, which can linger in the air for hours, as confirmed by a July 2020 study published by the CDC.[4]  Aerosols

---

[1] *CDC Confirms Possible Instance of Community Spread of COVID-19 in U.S.*, Centers for Disease Control and Prevention, https://www.cdc.gov/media/releases/2020/s0226-Covid-19-spread.html (last visited June 30, 2021).

[2] *How COVID-19 Spreads*, Centers for Disease Control and Prevention (last updated May 13, 2021), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited June 30, 2021); *Scientific Brief: SARS-CoV-2 and Potential Airborne Transmission*, Centers for Disease Control and Prevention (last updated May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html (last visited June 30, 2021).

[3] Ramon Padilla & Javier Zarracina, *WHO agrees with more than 200 medical experts that COVID-19 may spread via the air*, USA Today (last updated Sep. 21, 2020), www.usatoday.com/in-depth/news/2020/04/03/coronavirusprotection-how-masks-might-stop-spread-throughcoughs/5086553002/ (last visited June 30, 2021).

[4] Jianyun Lu & Zhicong Yang, *COVID-19 Outbreak Associated with Air Conditioning in Restaurant*, Guangzhou, China, 2020, 26 Emerging Infectious Diseases 11, Sep. 11, 2020, *available at* https://wwwnc.cdc.gov/eid/article/26/11/20-3774_article#suggestedcitation (last visited June 30, 2021) ("We conclude that the air conditioner prompted transmission of SARS-CoV-2; the customers in the airflow were at high

infect people far away from the infected person who emits them and can remain infectious after the infected person has left the premises. This kind of spread is referred to as aerosol transmission and typically happens through exhaled breath, even if the infected person does not cough or sneeze, as is necessary to release the larger virus-containing droplets in saliva and nasal discharge.

19.     Aerosol transmission involves the airborne transmission of viral RNA in particles smaller than 50 microns (human hair is about 80 microns), which do not settle onto surfaces like larger droplets emitted through saliva and nasal discharge.[5]

20.     Aerosol droplets are so small and transient that they can be pulled into air circulation systems and spread to other areas in a building.[6]  Indoor spaces with limited ventilation are particularly susceptible to aerosol transmission.

21.     Third, respiratory droplets can come to rest on surfaces and objects.  Surfaces, once physically affected by the coronavirus, are referred to as fomites.[7]  A person can get COVID-19 by touching a surface or object that has the virus on it and then touching his or her own mouth, nose, or eyes.

---

risk for infection with SARS-CoV-2 in the poorly ventilated environment. Because the staff and other diners were not exposed to the airflow mixed with SARS-CoV-2 transmitted by patient A1, their risk for infection was lower.").

[5] Jose-Luis Jimenez, *COVID-19 Is Transmitted Through Aerosols. We Have Enough Evidence, Now It Is Time to Act*, Time (Aug. 25, 2020), https://time.com/5883081/covid-19-transmitted-aerosols/ (last visited June 30, 2021); Pien Huang, *Researchers Say Fresh Air Can Prevent Aerosol Transmission Of The Coronavirus*, NPR (Sep. 7, 2020), https://www.npr.org/2020/09/07/910499236/researchers-say-fresh-air-can-prevent-aerosol-transmission-of-the-coronavirus (last visited June 30, 2021).

[6] Padilla & Zarracina, *supra* note 3 ("'You cannot separate out droplet and fine aerosol emissions in everyday activities like talking, breathing and laughing.' Many scientists believe droplets and aerosols are on a continuum of sizes. 'So if they accept that droplet transmission is happening they cannot exclude any contribution from aerosols.'"); Wenzhao Chen, et al., *Short-range airborne route dominates exposure of respiratory infection during close contact*, BUILDING & ENV'T 176 (June 2020), *available at* https://www.sciencedirect.com/science/article/abs/pii/S0360132320302183 (last visited June 30, 2021) (Abstract) ("The short-range airborne route is found to dominate at most distances studied during both talking and coughing.").

[7] Stephanie A. Boone & Charles P. Gerba, *Significance of Fomites in the Spread of Respiratory and Enteric Viral Disease*, Am. Soc'y for Microbiology (Mar. 13, 2007), https://aem.asm.org/content/73/6/1687 (last visited June 30, 2021).

22. Given these various means of spread and the highly contagious nature of the virus, retail establishments are particularly susceptible to the spread of the virus. Accordingly, PUMA's properties were vulnerable targets for the damage and loss that the coronavirus pandemic causes.

23. COVID-19 is not only highly contagious but deadly. According to the CDC, as of the date of this filing, over 33 million Americans have contracted the disease, of which over 600,000 have died.

24. Besides being deadly and having multiple known modes of transmission, the virus is challenging to contain because infected individuals can be asymptomatic and thus unaware that they might be spreading the virus merely by breathing, speaking and touching objects and surfaces. Studies have estimated that more than 40% of infected individuals may never develop any symptoms.[8] But even individuals who appear healthy and present no identifiable symptoms still "shed" the virus as they go about their lives.

25. Infected persons who actually contract COVID-19 "shed" the virus (i.e., pose a risk of viral transmission) before, during, and after their illness.[9] In fact, scientists have reason to believe that infected people are the most contagious *before* they experience symptoms, during what is called the "incubation" or "pre-symptomatic" period.[10] Pre-symptomatic and asymptomatic

---

[8] Erika Edwards, *Asymptomatic COVID-19 cases may be more common than suspected*, NBC News (May 27, 2020), https://www.nbcnews.com/health/health-news/asymptomatic-covid-19-cases-may-be-more-commonsuspected-n1215481 (last visited June 30, 2021).

[9] *How COVID-19 Spreads*, *supra* note 2.

[10] Seungjae Lee et al., *Clinical Course and Molecular Viral Shedding Among Asymptomatic and Symptomatic Patients With SARS-CoV-2 Infection*, JAMA Intern. Med. (Aug. 6, 2020), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2769235) (last visited June 30, 2021) (study revealing that viral loads were similar between the symptomatic and asymptomatic groups and actually decreased more slowly among the asymptomatic carriers, meaning that they had higher loads for longer); Lirong Zou et al., *SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients*, 382 NEW ENG. J. MED. 1177 (Mar. 19, 2020), *available at* https://www.nejm.org/doi/full/10.1056/nejmc2001737 (last visited June 30, 2021) ("The viral load that was detected in the asymptomatic patient was similar to that in the symptomatic patients, which suggests the transmission potential of asymptomatic or minimally symptomatic patients."); Monica Ghandi et al., *Asymptomatic Transmission, the Achilles' Heel of Current Strategies to Control Covid-19*, 382 NEW ENG. J. MED. 2158 (May 28, 2020), *available at* https://www.nejm.org/doi/full/10.1056/nejme2009758 (last visited June 30, 2021) ("Ultimately,

people infected with COVID-19 can unwittingly spread the virus, their infected status undetectable to themselves and those around them. A study published by CDC researchers confirmed the magnitude of this problem, estimating that transmission of the coronavirus from asymptomatic individuals accounts for *more than half of all transmissions*.[11]

26.     The incubation period, during which pre-symptomatic individuals can be most contagious but have no symptoms, can last up to fourteen days.[12] The impact of pre-symptomatic (and asymptomatic) transmission cannot be overstated, as it makes anyone who passes through PUMA's properties, symptomatic or not, a potential source of contagion that will leave an impact on the property long after the individual has left.

## II.    Coronavirus Is a Hazardous and Sometimes Deadly Substance That Causes Direct Physical Loss or Damage to Property

27.     Because COVID-19 is a pandemic, is known to have been on PUMA's properties in individuals who tested positive, and is statistically certain to have been carried by a percentage of untested individuals who have entered PUMA's properties since March of 2020, COVID-19 is continually reintroduced to the air and surfaces of PUMA's properties.

28.     Although droplets carrying the coronavirus are not visible, they are nonetheless physical objects carrying a virus that, like all other viruses, is a tangible substance. The virus hangs in the air, physically alters the air, and attaches to property for extended periods of time. Studies have shown that fomites—physical surfaces that promote infection—can become

---

the rapid spread of Covid-19 across the United States and the globe, the clear evidence of SARS-CoV-2 transmission from asymptomatic persons, and the eventual need to relax current social distancing practices argue for broadened SARS-CoV-2 testing to include asymptomatic persons in prioritized settings.").

[11] Michael A. Johansson et al., *SARS-CoV-2 Transmission From People Without COVID-19 Symptoms*, JAMA Network (Jan. 7, 2021) *available at* https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707 (last visited June 30, 2021).

[12] *Coronavirus disease 2019 (COVID-19) Situation Report – 73*, World Health Org. (Apr. 2, 2020), *available at* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (last visited June 30, 2021).

infectious on a whole range of surfaces, including stainless steel, wood, paper, plastic, glass, ceramic, cardboard, and cloth, many of which are used throughout PUMA's properties. The virus renders such properties unusable for an extended period of time.

29.     Fomites consist of both porous and nonporous surfaces or objects that can become infected with a virus and serve as vehicles of transmission. Fomites become infected with virus by direct physical contact with body secretions or fluids, contact with soiled hands, contact with virus droplets released while talking, sneezing, coughing, or vomiting, or contact with airborne virus that settles after disturbance of an infected fomite. Once a fomite is infected, the transfer of infectious virus may readily occur between inanimate and animate objects, or vice versa, and between two separate fomites.

30.     Unlike many other viruses that do not survive outside the body, the novel coronavirus is resilient and survives on surfaces for days. The virus thus compromises the physical integrity of the structures it permeates and poses an imminent risk of physical damage to all other structures.

31.     Moreover, the virus can remain suspended in the air for hours or days, altering the air and rendering the air inside PUMA's properties hazardous in addition to the visible surfaces. Between contagious surfaces and invisible particles suspended in the air, the coronavirus turned PUMA's properties into a gauntlet of deadly particles.

32.     The only way for people to avoid the coronavirus in PUMA's properties would be not to enter the properties in the first place, thus rendering the properties unusable for their intended purpose.

33.     Addressing the coronavirus is not merely a matter of cleaning, like one might do with a non-hazardous microscopic substance like dust. Numerous studies have demonstrated that

COVID-19 and the virus that causes it are not susceptible even to effective cleaning and that the particles are more resilient than many other respiratory viruses.

34.     Even the most aggressive cleaning regimen cannot eliminate aerosolized coronavirus particles from the air.  Just like cleaning friable asbestos particles that have landed on a surface from that surface will not remove the friable asbestos particles suspended in surrounding air—cleaning surfaces does not lessen the deadly impact of inhaled coronavirus aerosols.

35.     Given the ubiquity and pervasiveness of the coronavirus, no amount of cleaning or ventilation intervention will prevent an infected and contagious person—even one who is pre-symptomatic or asymptomatic—from entering an indoor space and exhaling millions of viral particles into the air, which:  (a) fills the air with aerosolized coronavirus that can be inhaled, sometimes with deadly consequences; and (b) deposits coronavirus particles on the surfaces, physically altering and transforming them into disease-transmitting fomites.

36.     The measures that must be taken to even partially or temporarily remove the coronavirus from property are significant and far beyond ordinary or routine cleaning or improved ventilation.  PUMA has undertaken many of these heightened measures in its insured properties in an attempt to repair the properties from their unsafe, hazardous, and potentially deadly condition. These efforts included installation of plexiglass barriers at insured properties, disinfecting insured properties, modifying employee schedules, and providing protective equipment to employees. Nevertheless, no amount of diligence can actually prevent coronavirus from causing physical loss or damage to surfaces and air within PUMA's insured properties.

37.     The presence of the coronavirus causes a physical, tangible alteration to property, and amounts to physical loss and/or damage to property. The presence of the virus or resulting COVID-19 disease renders property unusable and/or unfit for its normal occupancy or use. The

coronavirus and resulting COVID-19 disease cause physical property and physical space within and around properties to lose their functionality and ability to generate revenue causing business interruption and impairment to business income.

38.     Recognizing and in response to the vast physical loss or damage that the coronavirus had begun to cause, in mid-March 2020 many state and local governments began imposing sweeping restrictions on residents' daily lives and property to protect them.[13] Most states restricted or prohibited the operation of non-essential businesses or public gatherings or required individuals to stay at home except for essential purposes.

39.     States, counties, and cities where PUMA properties are located declared states of emergency.  They issued orders suspending or severely curtailing the operations of all non-essential or high-risk businesses and permitting residents to leave their homes only for limited purposes, such as for groceries, medicine, and to perform essential jobs.  The Orders directly impacted PUMA's insured properties, ultimately leading to the devastating financial losses at issue in this lawsuit.

40.     For example, on March 16, 2020, New York City Mayor Bill de Blasio issued an emergency executive order closing non-essential businesses in the city and declaring, "this order is given because of the propensity of the virus to spread person to person and also because **the virus physically is causing property loss and damage[.]**"[14] (Emphasis added).

41.     On March 19, 2020, Los Angeles Mayor Eric Garcetti issued a shutdown order that closed non-essential businesses and operations and directed residents to remain at home except for

---

[13] Jasmine C. Lee, et al., *See Reopening Plans and Mask Mandates for All 50 States*, N.Y. Times (updated June 30, 2021), https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html (last visited June 30, 2021).

[14] *See* Executive Order No. 100, City of New York Office of the Mayor (Mar. 16, 2020), *available at* https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf (last visited June 30, 2021) (emphasis added).

limited, essential purposes, recognizing that "the COVID-19 virus . . . **is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time**."[15] (Emphasis added).

42.     On March 22, 2020, Broward County, Florida issued Emergency Order 20-01 stating that the Order is "necessary because of the propensity of the virus to spread person to person and also because **the virus is physically causing property damage due to its proclivity to attach to surfaces for prolonged periods of time[.]**"[16] (Emphasis added).

43.     In San Diego, Mayor Todd Gloria, issued a series of executive orders, including stay-at-home orders, and explained that that these drastic measures were needed because of the unique characteristics of the novel coronavirus and, of particular relevance here, stating that "**COVID-19 physically causes property loss and damage.**"[17] (Emphasis added).

44.     Similar Orders were issued in other states where PUMA owns properties, with similar effects. Many specifically stated they were being issued because COVID-19 and/or the coronavirus has caused, causes, or will cause physical loss or damage to property.

45.     As the pandemic has evolved, the Orders have been renewed and amended by such authorities and, in many cases, continue to impose restrictions on non-essential businesses and operations, even as more Americans become vaccinated. In late 2020 and early 2021, as

---

[15] "Safer at Home," Public Order Under City of Los Angeles Emergency Authority (revised May 27, 2020), *available at* https://www.lamayor.org/sites/g/files/wph1781/files/page/file/20200527%20Mayor%20Public%20Order%20SAFER%20AT%20HOME%20ORDER%202020.03.19%20%28REV%202020.05.27%29.pdf (last visited June 30, 2021) (emphasis added).

[16] *See* Executive Order No. 20-01, Broward Cty. Admins. (Mar. 22, 2020), *available at* https://www.broward.org/CoronaVirus/Documents/BerthaHenryExecutiveOrder20-01.pdf (last visited June 30, 2021) (emphasis added).

[17] *See* Executive Order No. 2020-3, City of San Diego (Apr. 30, 2020), *available at* https://www.sandiego.gov/sites/default/files/mkf_executive_order_2020-04-30-2020_3.pdf (last visited June 30, 2021) (emphasis added).

coronavirus cases continued to increase throughout the United States, cities and states that had lifted Orders or loosened restrictions entered a "second wave" of lockdowns.

46.     The coronavirus also continues to evolve, further stymieing efforts to control the pandemic.  Multiple variants of the coronavirus are circulating globally, including variants originating in the United Kingdom, South Africa, and Brazil.  Ongoing research suggests these variants may spread more easily and quickly, making the coronavirus and COVID-19 disease even more dangerous and damaging to persons and property.

47.     Despite the sustained global effort to contain COVID-19, it is beyond dispute that the disease can be anywhere and everywhere. Although the coronavirus is not visible, it is nonetheless a physical substance that attaches to and infiltrates property, causing harm to such property. It is especially hazardous when it is located indoors where it cannot be eliminated from surfaces or the air via additional cleaning or improved ventilation.

## III.     PUMA Suffers Massive Financial Losses Resulting from the Pandemic

48.     Founded in 1995, PUMA North America, Inc. is the U.S. arm of German sportswear manufacturer, PUMA SE.  PUMA is one of the world's leading sports lifestyle brands.

49.     Known for both sports and fashion, PUMA designs and develops quality footwear, apparel and accessories. Specifically, PUMA offers performance and sports-inspired lifestyle products in categories such as soccer, running and training, basketball, golf, and motor sports. PUMA also engages in exciting collaborations with renowned design brands to bring innovative designs to the sports and leisure world.

50.     PUMA sells its products through wholesale accounts and PUMA stores, as well as online. PUMA prides itself on its reputation and ability to deliver exceptional products to its customers.

51.     PUMA's domestic business model relies on its ability to distribute, market and sell merchandise at brick-and-mortar locations across the United States, and PUMA relies upon the steady demand of individual consumers and customers in diverse industries, including sports and leisure.

52.     As a result of the coronavirus pandemic and related Civil Orders, PUMA's business, both abroad and in the United States, has incurred significant costs and losses.

53.     Within months after it was first detected in the United States, the ubiquitous coronavirus spread throughout all 50 states. Many individuals were carrying the virus with no symptoms, and the virus remained on surfaces for weeks and could not be visibly detected.

54.     Individuals working at PUMA locations throughout the world, including locations in the United States, are known to have contracted COVID-19.  Other employees and visitors to PUMA's facilities likely had the disease but did not know it because testing was not generally available in the early stages of the pandemic and a significant percentage of all transmission is caused by presymptomatic and asymptomatic people infected with COVID-19.[18]

55.     Thus, during the course of the global pandemic, the coronavirus has been present at PUMA's covered properties and locations, and the virus continues to pose an actual and/or imminent threat to the covered properties and locations.

56.     The coronavirus also has been present at the properties of PUMA's distributors, manufacturers and/or suppliers, and the virus continues to pose an actual and/or imminent threat to these properties.

---

[18] *See* Johansson et al., *supra* note 11.

57.     As a result of various Civil Orders and CDC guidelines, PUMA and certain of its distributors and/or suppliers shut down or appropriately limited operations and activities at various of their locations for various periods of time.

58.     Civil Orders were put in place as a direct result of physical loss and/or damage of the type insured at insured locations and other locations within one mile of such insured locations, and prohibited access to insured locations.

59.     PUMA incurred significant costs and losses caused by the coronavirus, the COVID-19 pandemic, and Civil Orders, which continue to the present day.

60.     As examples of its rising expenses, PUMA incurred substantial costs in cleaning supplies, janitorial services and has purchased services and products to keep its premises safe and sanitized.

61.     While PUMA's losses have taken many forms, its most significant losses are business interruption losses directly resulting from the physical loss of and/or damage to property caused by the threatened or actual presence of coronavirus, by the COVID-19 pandemic, and/or by the various Civil Orders that shut down or restricted activities at PUMA's insured properties or the covered properties of PUMA's distributors and/or suppliers.  Based on information currently available to PUMA, PUMA has suffered millions of dollars in lost revenue and/or profits.

62.     These losses and other damages continue to increase as the pandemic and related restrictions persist.

63.     As a result, PUMA has suffered, and likely will continue to suffer, significant business interruption losses and expenses.

**IV.    PUMA's "All Risks" Policy Issued by Zurich**

64.    In exchange for a substantial premium, PUMA purchased the Zurich Policy to protect it against precisely the types of costs and business interruption losses that it has incurred because of the coronavirus, COVID-19 pandemic and/or related Civil Orders.

65.    Zurich sold the Policy, numbered MCP 4386558, to PUMA as the Named Insured for the policy period July 1, 2019 to July 1, 2020.  A true and correct copy of the Policy is attached as Ex. A.

66.    The Policy provides up to $343,500,000 in coverage and provides a broad grant of coverage "against direct physical loss of or damage" to covered property, at insured locations subject to the terms, conditions and exclusions stated in this Policy.[19] Ex. A, Insuring Agreement.

67.    As drafted by Zurich, the Policy does not define what constitutes "physical loss of or damage to" real property.

68.    The Policy provides both "Property Damage" and "Time Element" (or business interruption) coverage.

69.    The basic "Property Damage" coverage in the Policy covers physical loss of or damage to certain real property and personal property owned by the Insured, as set forth more fully in the Policy.

70.    The basic "Time Element" coverage in the Policy covers business interruption loss measured by gross earnings, the calculation of which is set forth more fully in the Policy.  The Time Element coverage also covers reasonable and necessary "Extra Expenses" incurred by the Insured "to resume and continue as nearly as practicable the Insured's normal business activities

---

[19] None of the exclusions in the Policy apply to PUMA's claims herein.

that otherwise would be necessarily suspended, due to direct physical loss of or damage" from any cause unless excluded.

71.    Additionally, the Policy includes "Special Coverages", among them: Civil or Military Authority coverage, Contingent Time Element coverage, Decontamination Costs coverage, Ingress/Egress coverage, International Interdependency coverage, Protection and Preservation of Property, and Transit Time Element coverage, as set forth more fully in the Policy.

72.    By its terms, and as intended by the parties, the Policy is designed to cover exactly the type of damages and losses PUMA has suffered, and continues to suffer, resulting from the coronavirus, COVID-19 pandemic and/or related Civil Orders, including, among other things, costs expended to decontaminate its insured properties and to remove the actual presence of the coronavirus, as well as losses due to the interruption of PUMA's business activities and sales.

73.    Further, PUMA reasonably expected that the Zurich Policy would cover such costs and losses arising from a global pandemic based on the Policy's broad insuring provisions and narrow exclusions, none of which applies to PUMA's losses at issue in this Complaint.

## V.    The Pandemic and Related Civil Orders Triggered Multiple Coverages Under the Policy

### a.    PUMA Has Suffered Compensable Time Element Losses Under The Policy.

74.    The Zurich Policy insures Time Element losses that "result from the necessary Suspension of the Insured's business activities at an Insured Location" if the Suspension is "due to direct physical loss of or damage to Property…caused by a Covered Cause of Loss at the Location," as specified in the Policy. Ex. A, at 5 of 44.

75.    The Policy defines Suspension, in relevant part, as the "slowdown or cessation of the Insured's business activities[.]" Ex. A, at 44 of 44.

-16-

76.    Covered Cause of Loss is defined in the Policy as "[a]ll risks of direct physical loss of or damage from any cause unless excluded." Ex. A, at 39 of 44.

77.    PUMA's Insured locations include, among others, those business locations identified on the Schedule of Locations in the Policy.

78.    As discussed above, PUMA has suffered, and continues to suffer, financial losses resulting from the necessary slowdown and/or cessation of its business activities due to direct physical loss of or damage to property of the type insurable under the Policy caused by COVID-19, the coronavirus and/or Civil Orders entered in connection with the pandemic, at its insured locations.

79.    As a result of the foregoing, PUMA has sustained actual loss, including losses of gross earnings, diminished sales, additional operational and other extra expenses, increased costs of doing business and other covered losses, compensable as Gross Earnings loss and covered by the Policy.  Ex. A at 5-6 of 44.

80.    Additionally, PUMA has spent reasonable and necessary amounts to resume and continue, as nearly as practicable, the conduct of its normal business activities that otherwise would be necessarily suspended due to direct physical loss of or damage caused by COVID-19, the coronavirus and/or the Civil Orders.  These extra expenses include, but are not limited to, expenses for COVID-19 monitoring, cleaning supplies, protective gear and equipment, physical and structural modifications, and other operational changes.

81.    PUMA would not have incurred these expenses in conducting its business during the same period had no physical loss or damage occurred.

82.     For example, PUMA instituted protocols for cleaning and disinfection at its properties, and incurred costs to enable remote working environments and to maintain a safe work environment.

83.     The Policy provides coverage for the payment of these reasonable and necessary Extra Expenses. Ex. A, at 7 of 44.

84.     PUMA's Time Element losses are ongoing and likely to persist.

85.     PUMA has taken all reasonable steps to mitigate its losses where possible.

**b. PUMA Has Sustained Losses Insured by the Policy's Civil Authority Coverage.**

86.     The Policy covers "the actual Time Element loss sustained by the Insured…resulting from the necessary Suspension of the Insured's business activities at an Insured Location if the Suspension is caused by order of civil or military authority that prohibits access to the Location**,**" provided such order results from "a civil authority's response to direct physical loss of or damage caused by a Covered Cause of Loss to property not owned, occupied, leased or rented by the Insured or insured under this Policy" within one (1) mile of the Insured Location. Ex. A, at 11-12 of 44.

87.     PUMA has sustained, and will continue to sustain, Time Element losses because Civil Orders, issued as a direct result of physical loss of and/or damage to property of the type insured to third-party property within one (1) mile of insured locations, have prohibited access to PUMA's properties.  None of these third-party properties are owned, occupied, leased or rented by the Insured or insured under the Policy.

88.     The coronavirus, COVID-19 pandemic and Civil Orders have caused physical loss of and or damage to numerous third-party properties within one (1) mile of insured locations.

89.     PUMA has taken all reasonable steps to mitigate its losses where possible.

      **c.   PUMA Has Sustained Losses Insured by the Policy's Coverage for Contingent Time Element.**

90.    The Policy covers the "actual Time Element loss…sustained by the Insured during the Period of Liability directly resulting from the necessary Suspension of the Insured's business activities at an Insured Location if the Suspension results from direct physical loss of or damage caused by a Covered Cause of Loss to Property (of the type insurable under this Policy) at Direct Dependent Time Element Locations, Indirect Dependent Time Element Locations, and Attraction Properties" located worldwide. Ex. A, at 12 of 44.

91.    Excluding exceptions not relevant here, Direct Dependent Time Element Locations includes "[a]ny Location of a direct: customer, supplier, contract manufacturer or contract service provider to the Insured[.]" Ex. A, at 40 of 44.

92.    Excluding exceptions not relevant here, Indirect Dependent Time Element Locations includes any Location of a company that is a direct or indirect: customer, supplier, contract manufacturer or contract service provider to a Direct Dependent Time Element Location. Ex. A, at 41 of 44.

93.    PUMA sustained actual Time Element loss directly resulting from the necessary slowdown and/or cessation of its business activities at its Insured Locations as a direct result of physical loss of or damage caused by a Covered Cause of Loss to Property at covered Direct Dependent Time Element Locations and/or Indirect Dependent Time Element Locations and/or Attraction Properties, including but not limited to, locations of PUMA's individual and commercial customers, and its suppliers, contract manufacturers and service providers, and locations of companies that are customers, directly supply, are contract manufacturers or have service agreements with PUMA's direct customers, suppliers, contract manufacturers or service

providers. This includes physical loss of or damage to real and personal property resulting from Civil Orders and the presence of coronavirus and COVID-19 at such locations.

94.     For example, as a direct result of Civil Orders and/or the presence of coronavirus or COVID-19 at such locations, PUMA consumers sheltered in place, quarantined or were inhibited from traveling to PUMA stores, outlets and other PUMA insured locations. Additionally, PUMA's commercial customers suspended or limited their business operations that utilized PUMA products, and/or PUMA suppliers and/or distributors halted or reduced their operations for periods of time. Additionally, the presence of the virus at schools resulted in the cessation of school sports activities, which also caused PUMA to suffer losses.

95.     PUMA has taken all reasonable steps to mitigate its contingent time element losses where possible.

### d. PUMA Has Sustained Losses Insured by the Policy's Ingress/Egress Coverage.

96.     The Policy covers the "actual Time Element loss sustained by the Insured…resulting from the necessary Suspension of the Insured's business activities at an Insured Location if ingress or egress to that Insured Location by the Insured's suppliers, customers or employees is prevented by physical obstruction due to direct physical loss of or damage caused by a Covered Cause of Loss to property not owned, occupied, leased or rented by the Insured" within one (1) mile of the Insured Location." Ex A, at 16 of 44.

97.     As explained above, the coronavirus, fomites and respiratory droplets adhere and attach to common surfaces and materials, thereby structurally altering and physically changing those materials, and making them dangerous and unsafe. This process impairs and physically damages the materials and the property affected.

98. These circumstances prevented ingress to and egress from PUMA's insured Locations by PUMA's suppliers, distributors, customers and/or employees.

99. The widespread presence of coronavirus, fomites, and respiratory droplets within the vicinity of Insured Locations, including at third-party locations within one mile of Insured Locations, and resulting Civil Orders created physical obstructions that prevented travel to, travel from, and entering Insured Locations.

100. As a result of these preventions of ingress to and egress from PUMA's Insured Locations, PUMA's business operations were interrupted and PUMA sustained millions of dollars in losses.

101. PUMA's losses due to prevention of ingress and egress are ongoing and likely to persist.

102. PUMA has taken all reasonable steps to mitigate its contingent time element losses where possible.

### e. PUMA Has Sustained Losses Insured by the Policy's International Interdependency Coverage.

103. The Policy insures payment for the "actual Time Element loss sustained by the Insured…resulting from the necessary suspension of the Insured's business activities at an Insured Location, if the suspension is caused by direct physical loss of or damage to Property (of the type insurable under this Policy other than Finished Stock) caused by a Covered Cause of Loss at a Location, that would be an Insured Location if it were located in the Coverage Territory of this Policy." Ex. A, at 16-17 of 44.

104. PUMA's U.S. operations and U.S. sales performance depends, among other things, on the steady and reliable supply of finished product from its production facilities outside the United States.

105.     These production facilities are covered locations under the Policy's "International Interdependency" provision because they would be an Insured Location if they were located in the United States.

106.     The direct physical loss and/or damage to these facilities due to the actual presence of the virus and attendant Civil Authority orders resulted in the necessary slowdown and/or cessation of PUMA's business activities, thereby causing PUMA to suffer actual Time Element loss covered under the Policy.

### f.  PUMA Has Incurred Costs to Protect and Preserve Insured Property.

107.     Subject to any applicable deductibles and time and policy limits, the Policy covers the "reasonable and necessary costs incurred for actions to temporarily protect or preserve Covered Property; provided such actions are necessary due to actual or imminent physical loss or damage due to a Covered Cause of Loss to such Covered Property" and provided the Insured takes reasonable action for the temporary protection and preservation of covered property.  Ex. A, at 20 of 44.

108.     PUMA sustained reasonable and necessary costs to protect and preserve covered property due to actual or imminent physical loss or damage to property due to the actual or imminent presence of coronavirus or COVID-19 disease at its covered premises, including costs to clean facilities and to put in place physical barriers and other measures to prevent the spread of coronavirus or COVID-19 disease at its premises.

### g.  PUMA's Losses Trigger Other Coverages Under the Policy.

109.     In addition to the losses and coverages described above, PUMA's pandemic-related losses are covered under any and all other coverages provided under the Policy that may apply,

including but not limited to, Decontamination Costs and Transit coverage. Ex. A, at 14, 22-23 of 44.

## VI.    **Zurich Could Have Excluded, But Did Not Exclude, All Losses Arising from Viruses**

110.    Prior to the COVID-19 pandemic, Zurich was well aware of the potential impact of a pandemic on its property insurance business, including through publicly available reports about the risks of pandemics and what insurers should do to prepare. For example, one 2018 article noted that:

> Even with today's technology, a modern severe pandemic would cause substantive direct financial losses to the insurance community. In addition, indirect losses would be severe, most notably on the asset side of the balance sheet.[20]

111.    One library of insurance industry publications, the Insurance Library Association of Boston, updated in early 2020, demonstrates just how much information was available to insurers, including Zurich, regarding pandemics prior to COVID-19:

> The past 20 years ha[ve] seen the rise of a number of pandemics. Slate recently published an article on what has been learned about treating them in that time. We thought it might be apt for us to take a look back and see what the insurance industry has learned as well.[21]

112.    In 2006, the Insurance Services Office (ISO) (an insurance industry trade group) responded by drafting and procuring regulatory approval of a new standard form endorsement, CP 01 40 07 06, "Exclusion Of Loss Due To Virus Or Bacteria."

113.    The ISO virus endorsement acknowledged that business interruption claims would be filed under existing policy language for losses resulting from the presence of disease-causing agents like a coronavirus.

---

[20] Narges Dorratoltaj & Doug Fullam, *What the 1918 Flu Pandemic Can Teach Today's Insurers*, AIR (Mar. 29, 2018), https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Today-s-Insurers/ (last visited June 30, 2021).

[21] *Pandemics and Insurance*, Ins. Libr. (Feb. 7, 2020), http://insurancelibrary.org/pandemics-and-insurance/ (last visited June 30, 2021).

114. The endorsement, which various insurers have since incorporated into their policies, provides that the insurer "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."

115. Despite the availability of an ISO virus endorsement for well over a decade prior to Zurich's issuance of the Policy, Zurich did not include it in its policy form. It also did not include other pandemic-specific exclusions available in the market. Thus, Zurich anticipated, or reasonably should have anticipated, that it would be liable for losses like PUMA's COVID-19-related losses.

**VII.    PUMA's Claim for Coverage**

116. In early May 2020, when nearly all of PUMA's corporate-owned retail locations and wholesale business operations were closed due to Civil Orders and/or the presence of coronavirus or COVID-19 disease at covered locations, PUMA gave prompt notice of its claim to Zurich.

117. Nearly 7 months later, by letter dated December 2, 2020, Zurich acknowledged that 90% of PUMA's business continued to be adversely impacted by the COVID-19 pandemic, but failed to make any payment under the Policy and did not commit to covering any of PUMA's losses. Instead, Zurich merely reserved its rights, informed PUMA that it was "investigating the claim," and told PUMA it would provide its coverage position "as soon as [its] investigation is complete." Following this letter, Zurich requested information from PUMA, which PUMA provided. Thus, PUMA's understanding was that Zurich was engaged in an investigation of coverage during this time period. It was not until May 21, 2021 that Zurich formally denied coverage on the grounds that COVID-19 does not cause "physical loss of or damage to" property

under the Policy, an exclusion in the Policy for "Contamination, and cost due to Contamination" barred coverage, and an exclusion in the Policy relating to laws and ordinances barred coverage.

118.    Months earlier, however, Zurich had denied coverage under an international "master policy" it had issued to PUMA on largely the same grounds. Thus, under the pretext of a never-ending coverage "investigation," Zurich lulled PUMA into sitting on its hands for months.

119.    Zurich's failure to cover PUMA's claim and its denial of coverage are baseless and has harmed PUMA by depriving it of the insurance coverage it purchased.

120.    Indeed, Zurich's reliance on the "Contamination" exclusion is misplaced. Zurich was aware of and had available to it broad language purporting to exclude losses directly or indirectly caused by or resulting from viruses. Zurich chose not to include such an exclusion in the Zurich Policy.

121.    Instead, the "Contamination" exclusion "excludes the following unless it results from direct physical loss or damage not excluded by this Policy":

> 3.03.01.01    Contamination, and any **cost** due to Contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided by the Radioactive Contamination Coverage of this Policy.

Ex. A, at 2 of 44 (emphasis added).

122.    The Policy originally defined "Contamination" as "[a]ny condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, Fungus, mold or mildew." Ex. A, at 39 of 44.

123.    This exclusion, however, was modified by an endorsement, which removed from the Policy's definition of contaminant the words "pathogen or pathogenic organism, bacteria,

virus, disease causing or illness causing agent." Unlike other endorsements in the Policy, this endorsement was not limited to property in a particular state.

124.    Additionally, the Policy's original "Contamination" exclusion expressly applies only to "costs" due to contamination where decontamination is not subject to law or ordinance. It makes no mention of "losses." Nor does it encompass costs that may be caused by something other than contamination such as Civil Orders or communicable disease, such as COVID-19. Nearly all of the covered amounts that PUMA seeks from Zurich are "losses" as that term is used in the Policy, not "costs" as that term is used in the Policy. PUMA's losses are also the result of physical loss and/or damage caused by Civil Orders and/or communicable disease. They are not due to contamination.

125.    The Policy terms show that Zurich knew how to broadly exclude categories of "loss" when that was Zurich's intent. In contrast to the contamination exclusion, the Policy contains a list of exclusions for "direct physical **loss or damage directly or indirectly** caused by or resulting from" certain specified causes or events, "whether or not insured under this Policy, **contributing concurrently or in any other sequence** to the loss[.]" Ex. A, at 3 of 44 (emphasis added). However, none of the losses that PUMA is seeking from Zurich directly or indirectly were caused by any of the specific causes or events identified in the Policy's list of exclusions.

126.    PUMA is not seeking coverage for contamination or costs due to contamination, but for business interruption losses. The Policy's contamination exclusion does not apply to the Time Element (*i.e.*, business interruption) losses discussed above that PUMA has suffered and that PUMA is seeking under the Policy.

127.    Accordingly, the Policy's contamination exclusion does not apply to the losses that are the subject of PUMA's claim in this lawsuit and none of the other exclusions in the Policy applies to limit or bar coverage for PUMA's losses.

## CAUSES OF ACTION

### COUNT I
### (Breach of Contract)

128.    PUMA repeats and realleges the above allegations as if fully set forth herein.

129.    The Policy is a valid and enforceable contract between PUMA, as the "Named Insured," and Zurich, as the "Insurer" providing insurance coverage, under the Policy.

130.    In the Policy, Zurich agreed to insure covered property against all risks of direct physical loss of or damage to property not otherwise excluded, including the coverages contained in the "Property Damage", "Time Element" and "Special Coverages" portions of the Policy.

131.    As described above, PUMA sustained, and is continuing to sustain, losses covered under the Policy.

132.    PUMA provided prompt notice of its losses and has performed all obligations required of it under the Policy.

133.    Zurich breached its coverage obligations to PUMA by wrongfully denying coverage and failing to cover PUMA's losses or to pay any amount towards such losses.

134.    Under the terms of the Policy, Zurich must pay PUMA's losses up to the full limit of the Policy, subject only to sublimits, time limits, waiting periods, and/or deductibles for specific coverages.

135.    No exclusions apply to bar coverage.

136.     As a direct and proximate result of Zurich's breach of contract, PUMA has suffered and will continue to suffer damages in an amount to be determined at trial, plus consequential damages, attorneys' fees, pre- and post-judgment interest, and any other costs and relief that the Court deems appropriate.

## COUNT II
### (Declaratory Judgment)

137.     PUMA repeats and realleges the above allegations as if fully set forth herein.

138.     There is a genuine and bona fide dispute, and an actual and justiciable controversy exists, between PUMA and Zurich concerning the proper construction of the Zurich Policy, and the rights and obligations of the parties thereto, with respect to the losses incurred by PUMA and sought in this lawsuit.

139.     Under the terms of the Policy, Zurich must pay, up to the limit of liability, for PUMA's costs and/or losses covered under the Policy, subject only to applicable sublimits, time limits, waiting periods, and/or deductibles for specific coverages.

140.     As detailed above, PUMA's losses are covered under multiple coverages of the Policy and are not excluded from coverage.

141.     Zurich disputes its legal obligation to pay PUMA's claim.

142.     Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, PUMA seeks a declaratory judgment in favor of PUMA and against Zurich that PUMA is entitled to coverage under the Policy, including without limitation under each of the various coverage provisions identified in this Complaint, and that no policy exclusion applies to bar or limit coverage for PUMA's losses and costs sought in this Complaint.

143.    The issuance of declaratory relief by this Court will terminate the existing controversy among the parties.

144.    By clarifying the parties' rights and duties under the Policy, a declaratory judgment would guide Zurich's treatment of PUMA's covered, but yet unaccrued, losses, in addition to the significant losses PUMA has already incurred.  Because PUMA's unaccrued losses have not yet ripened such that a final amount of damages can be ascertained, the declaratory judgment claim would afford PUMA relief independent of the breach of contract claim.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff PUMA North America, Inc., respectfully requests that the Court enter judgment in its favor and against Zurich as follows:

a.    On the First Cause of Action, PUMA requests that the Court enter judgment against Zurich, awarding PUMA damages in an amount to be determined at trial, plus consequential damages, attorneys' fees, and pre- and post-judgment interest;

b.    On the Second Cause of Action, PUMA requests that the Court enter a declaratory judgment in favor of PUMA and against Zurich declaring that:

1.    PUMA's losses are covered under the Policy;

2.    Zurich is required to pay PUMA, up to the applicable limits of the Policy, for all losses covered under the Policy; and

3.    No exclusion bars coverage.

c.    For all Causes of Action, all pre-judgment and post-judgment interest to the extent allowed by law and all costs incurred as a consequence of having to prosecute this lawsuit, including attorneys' fees; and

d.    PUMA requests such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

PUMA demands a trial by jury on all issues so triable.


Dated: July 2, 2021

By: /s/ Jeffrey M. Hansen

Jeffrey M. Hansen (ARDC 6269900)
Douglas A. Albritton (ARDC 6228734)
Actuate Law, LLC
641 West Lake Street, 5th Floor
Chicago, Illinois 60661
Telephone: (312) 579-3131
jeff.hansen@actuatelaw.com
doug.albritton@actuatelaw.com


and


Robin L. Cohen, Esq.*
Orrie A. Levy, Esq.*
Cohen Ziffer Frenchman
& McKenna LLP
1350 Avenue of the Americas, 25th Floor
New York, New York 10019
Telephone: (212) 584-1890
rcohen@cohenziffer.com
olevy@cohenziffer.com

***Counsel for Plaintiff PUMA***
***North America, Inc.***


* Petition for Admission *Pro Hac Vice* to be filed